UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| STOP ILLINOIS HEALTH CARE FRAUD, LLC, | ) | |
| a Delaware Limited Liability Company, | ) | |
| individually and on behalf of and in the | ) | |
| names of the United States of America and | ) | |
| The State of Illinois, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 12 – CV - 9306 |
| | ) | |
| ASIF SAYEED, an Illinois Resident; HEALTHCARE | ) | |
| CONSORTIUM OF ILLINOIS, an Illinois Corporation; | ) | |
| MANAGEMENT PRINCIPLES, INC., an Illinois | ) | |
| Corporation; VITAL HOME & HEALTHCARE, INC., an | ) | |
| Illinois Corporation; PHYSICIAN CARE SERVICES, S.C., | ) | |
| an Illinois Corporation, d/b/a Home Physician Care | ) | |
| Services, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT *QUI TAM*

This matter is brought by the *Qui Tam* Plaintiff, Stop Illinois Health Care Fraud, LLC, a

Delaware Limited Liability Company, by and through their undersigned counsel, Busse, Busse &

Grasse, P.C., for themselves and for the United States of America, and the State of Illinois, as an

action *qui tam* pursuant to 31 USC § 3730(b)(1), and the Illinois False Claims Act, 740 ILCS

175/1 *et seq*. and in support thereof, Plaintiff alleges as follows:

## I. **The Parties**

### A. **Scheme Leader Defendant - Asif Sayeed**

1.      Asif Sayeed resides at 1001 Prestwick Drive, Frankfort, IL 60423, he was born in January

of 1949.

2.     Mr. Sayeed is businessperson and entrepreneur in the suburban Chicago area. Mr. Sayeed has a lengthy and notorious history of healthcare related fraud.

3.     Mr. Sayeed graduated from Governor's State University in University Park, Illinois, in 1986 with a bachelor's degree and later graduated from Harvard University Business School in 1992.  Over the last two decades, Mr. Sayeed has founded and owned multiple healthcare companies.

4.     Between 1984 and 2000, he was President/CEO of American Health Care Providers, Inc., an HMO licensed under the Illinois Insurance Department.  At its peak, American had annual revenues in excess of $500 million and was one of the 3 largest HMO's in Illinois. However, in 2000, the Illinois Department of Insurance suddenly ordered the company into liquidation because of insolvency.  Later that year, the State Insurance Director sued Mr. Sayeed and his wife, Shaheen Sayeed (who acted as the Chief Operating Officer) and accused them of fraud and gross mismanagement of the HMO's reserves.

5.     The scheme that the Sayeeds operated through American Health Care Providers, Inc. involved utilizing multiple affiliated and owned sub-companies who entered into lease arrangements and other transactions designed to take cash from the HMO. The Sayeeds were accused of using the HMO money to pay for luxury cars, including a Lamborghini and two Bentleys, and jet airplanes.

6.     Following the well-publicized turmoil with American, Mr. Sayeed did not exit the business of medical fraud in Illinois. Instead, Mr. Sayeed has created multiple entities including three entities from which he presently conducts the fraudulent referral enterprise which is the basis of this suit.  Those entities are: Management Principles, Inc.

("MPI") – which acts as a lead generator and referral source; Vital Home and Healthcare, Inc. ("Vital") –which receives the unlawful referrals and then provides home health services; and Physician Care Services, doing business under the registered assumed name Home Physician Care Services - which also receives these unlawful referrals and also performs bogus Home health care face to face and recertification for Vital.

7.     Additionally, Mr. Sayeed has numerous real estate holdings, including commercial property from which these related healthcare companies operate and three others properties including his home.  He owns two beach front properties in Florida: One in Hollywood and one in Ft. Lauderdale.  These homes are valued in the millions of dollars each.

8.     Mr. Sayeed also has a network of affiliated healthcare businesses.  Although the conduct outlined above primarily involves just three related entities, it is believed that unlawful conduct is being perpetrated by numerous other healthcare affiliated entities own by Mr. Sayeed.

**B.     Healthcare Consortium of Illinois ("HCI")**

9.     The unlawful referral practices detailed herein begin with Healthcare Consortium of Illinois, ("HCI").

10.    HCI provides case management services through the Illinois Community Care Program. The program's provisions can be found under Title 89, Chapter II, Part 240 of the Illinois Administrative Code.  The Illinois Community Care Program is administered by the Illinois Department of Aging and paid for through Medicaid as a waiver program. The Department of Aging has licensed Community Care Program Care Coordination Units

3

("CCUs") in 13 areas in Illinois. There are a limited number of licensed Community Care Program providers. Those are listed on the Department of Aging website at http://www.state.il.us/aging/1directory/ccpccu.pdf. One such licensee is HCI, which serves Southwestern and South-Southeastern Chicago, ZIP Codes 60609, 60617, 60619, 60620, 60621, 60623, 60627, 60628, 60629, 60632, 60633, 60636, 60638, 60643, 60652, 60655, 60827. Further information regarding CCUs is explained at http://www.state.il.us/aging/1athome/case-mgmt.htm.

11.    HCI is a non-profit organization designed to provide or act as a "network of networks" with a full range of healthcare and social service providers. HCI is located at 1350 East Sibley Boulevard, Suite 303, Dolton, Illinois. Their telephone number is 708-841-9515.

12.    According to Illinois Secretary of State filings, the registered agent of HCI is Dalim Al-Nurridin. There is also believed to be a personal relationship between HCI's principal/CEO Salim Al-Nuridi and Asif Sayeed, as both serve on the Muslim Advisory Council-State of Illinois.

13.    HCI is lawfully permitted on behalf of the Illinois Department of aging to perform health, wellness and safety assessments of Illinois residents who may be in need of social services. However, HCI's unlawful conduct occurs when it takes this protected beneficiary data and unlawfully provide it to marketers at MPI, Vital and PCS. These marketers then directly call the beneficiaries, represent to the beneficiaries that the call is coming from the "Department of Aging" and then unlawfully and fraudulently solicit Medicare-elgible services to these patients.

14.    In particular, three employees of HCI have been identified as being involved in this conduct: Candace Brooks, Rosetta l/k/u (believed to be Cutright); and Malika Mohammed. These individuals provide provide patient lists that HCI obtains through HCI's role as a licensed CCU to Management Principles, Inc., which then uses that information to solicit home health services.

### C.    Management Principles, Inc. ("MPI")

15.    Management Principles, Inc. ("MPI") operates as the marketing entity for the illegal referral scheme detailed herein.

16.    According to filings with the Illinois Secretary of State, MPI was incorporated in December 2004.  MPI's president is Mr. Sayeed and its registered agent is Mr. Asim Farooqi.  Upon information and belief, Asif Sayeed and Asim Farooqi are childhood friends from India.  Mr. Sayeed sponsored Mr. Asim Farooqi during his visa process to come to the United States to work for him. The Illinois Secretary of State filings disclose the address of the registered agent as 8051 186th Street, Tinley Park, Illinois 60487. That real estate is personally owned by the Mr. Sayeed and his wife.  According to the deed recorded in Will County, Illinois, the property was purchased in March of 2005 for $995,000.00. This is the same address that is used by Vital Home and Healthcare, Inc.

17.    All three entities (i.e., MPI, Vital and PCS) operate out of 8051 186th Street, Tinley Park, and are, in practice, operating as a single entity.  MPI's staff and marketers operate in the same office space, and directly next to the staff and administration personnel employed by Vital Home & Healthcare as well as the employees of Physician Care Services, S.C. Upon information and belief, they are literally desks apart.

18.    Upon information and belief MPI's only activity is to engage in cold calling and/or marketing of Medicare eligible patients for health services to on behalf of PCS and Vital Home & Healthcare, Inc.  Investigation has not disclosed any other legitimate business purpose engaged in by MPI.

### D.    Vital Home and Healthcare, Inc. ("Vital")

19.    Vital Home and Healthcare, Inc. is an Illinois home health agency licensed by the State of Illinois Department of Health.    Vital's license number is 1007087. (See www.data.illinois.gov).  Its NPI number is 1801992938.  As discussed above, Vital operates out of the offices at 8051 186th Street, Tinley Park, Illinois 60487.

20.    Illinois Secretary of State filings disclose that, Vital's President is Mr. Sayeed and its Secretary is Asim Farooqi.  In addition to the office in Tinley Park, Illinois, Vital also has an office in Munster, Indiana.  Its website is www.vitalhomehealth.com.

21.    Vital provides the typical Medicare reimbursable home health services such as skilled nursing, occupational therapy and physical therapy ("OT/PT"), home health medical social workers and speech therapy.  As is detailed above, Vital receives its patients through illegal referrals from MPI, using the information obtained by HCI and passed along to MPI.

### E.    Physician Care Services, SC ("Physician Care")

22.    Physician Care Services, SC, an Illinois Corporation which also has the active assumed and registered name of "Home Physician Care Services," is the entity which provides the in-home physician services for patients obtained through the referral scheme outlined above.

23.     According to the Illinois Secretary of State filings, Physician Care's President is Anish Kadakia and the Secretary is Asim Farooqi.  Mr. Farooqi is also the registered agent.  The entity was incorporated on June 22, 2006.  The address for Physician Care is the same as both Vital and MPI, 8051 186th Street, Tinley Park, Illinois 60487.

24.     According to the Physician Care website (http://homephysiciancareservices.com) Physician Care delivers all services that might be expected from a family physician.  The website also makes clear that by making house calls, they primarily serve Medicare beneficiaries under Medicare Part B.  There are approximately 10 physicians that work at Physician Care Services.   According to the Illinois Department of Financial Professional Regulations, Physician Care Services, SC, has the license number 042618942, which has been active since November 8, 2006. According to LexisNexis database searches, the Office Manager is Sonequa Cain and the listed contacts are Sakina Sayeed Kadakia and Asif Sayeed.

**II.     <u>Jurisdiction and Venue</u>**

25.      This action arises under 31 U.S.C. §§ 3729 *et seq.,* known as the False Claims Act.

26.     Jurisdiction over the claims under the False Claims Act in this action is conferred on this Court by 31 U.S.C. § 3732(a), which provides for federal district court jurisdiction for claims brought pursuant to the False Claims Act, and 28 U.S.C. § 1331, because this civil action arises under the laws of the United States.

27.     This Court has jurisdiction over the claims brought under state law pursuant to 31 U.S.C. § 3732(b), which provides for federal district court jurisdiction of actions brought under the laws of any state for the recovery of funds paid by a State or local government if the

action arises from the same transaction or occurrence as an action brought under the False Claims Act. Additionally, this Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367(a).

28.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to the claim occurred Chicago, Cook County, Illinois. Venue is further proper in this judicial district under 28 U.S.C. § 1391(b)(2), because MPI, Vital and Physician Care share a principal place of business in Tinley Park, Cook County, Illinois.

### III.     The Medicare Program and Home Health Services

29.     The Medicare program was created in 1965 as part of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.,* to provide a federally funded health insurance program for the aged and disabled. The United States, through the Department of Health and Human Services, administers the program, and has delegated the administration of the Medicare Program to the Health Care Financing Administration, a component of the Department of Health and Human Services.

30.     The Medicare program consists of two basic parts - Part A (42 U.S.C. §§ 1395c - 1395i-5) and Part B (42 U.S.C. §§ 1395j - 1395w-4). Part A covers all inpatient hospital services provided to eligible persons, known as Medicare beneficiaries. In addition, Part A covers certain home health services provided to Medicare beneficiaries who do not have Part B coverage. Part B provides coverage for a wide range of outpatient services, including for home health services for Part B eligible persons.

31.     Medical treatment and services are reimbursable under Medicare in accordance with the laws and regulations established by the United States through its agencies. Certain items and services are specifically excluded from reimbursement under Medicare, including: items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, (42 U.S.C. § 1395y(a)(1)(A)) and the frequency and duration of home health services which are in excess of normative guidelines that the Secretary shall establish by regulation (42 U.S.C. § 1395y(a)(1)(I).

32.     Federal law further specifically includes as a violation of the False Claims Act any violation of 42 U.S.C. § 1320a-7b, including knowingly and willfully making or causing to be made any false statement or representation of a material fact in any application for any benefit or payment under a Federal health care program, and offering, paying or receiving any remuneration for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program. Federal law requires that entities provide economical medical services and, then, only where medically necessary, 42 U.S.C. § 1320c-5(a)(1), and provide evidence that the service given is medically necessary, 42 U.S.C. § 1320c-5(a)(3).

## IV.    **Medicaid**

33.     Medicaid, officially known as the Grants to States for Medical Assistance Programs pursuant to Title XIX of the Act, 42 USC 1396 *et seq.*, is a needs-based assistance

program and is jointly funded by the United States and individual States, including Illinois.

## V. **Community Care Program**

34.    The Community Care Program is a program administered through the Illinois Department of Aging, under provisions which can be found at Title 89, Chapter II, Part 240 of the Illinois Administrative Code. The CCP program is paid for under the Medicaid as one of the waiver programs, and through the joint-funding structure of Medicaid, involves claims being submitted to both the State of Illinois and the United States.

35.    In order to manage services under the program, the Department of Aging has licensed Community Care Program Care Coordination Units ("CCUs") in 13 areas in Illinois. There are a limited number of licensed Community Care Program providers. The CCP program is a typical Medicaid waiver program that provides, among other things, unskilled and/or homemaker services to needy beneficiaries under Medicaid. Typically, the CCU designated by the Department of Aging in that area will receive a referral through the Illinois Department of Aging to perform a comprehensive assessment of a participant/beneficiary.  Following the assessment, the participant is qualified for the potential services offered by the CCP.  Section 240.340 of Title 89, Chapter II, Part 240 makes clear that the information obtained by the CCU is supposed to be confidential and only used to provide the services available under the Community Care Program.  This provision is being violated on a widespread basis as detailed herein.

## VI.    **The Illegal Referral Scheme**

36.     The entities herein are involved in an unlawful kickback and referral scheme involving multiple Illinois-based organizations which results in the unlawful marketing and soliciting of Medicare eligible participants for healthcare services. The entities involved are two affiliated healthcare providers and a marketing company which purportedly has a "contract" with a Department of Aging approved Community Care Coordination Unit ("CCU"), as discussed more fully *supra*. The healthcare organizations serve patients in the City of Chicago area. These health care entities and marketing entity are related in that they have a common ownership and work out of the same building. The sharing of information amongst these entities is further achieved by the sharing of employees.

37.     Upon information and belief, the entities are conspiring to defraud both Medicare and the State of Illinois' Medicaid program by paying a CCU employee for a list of CCU participants - including the confidential information that the participants have provided to the CCU intake person.   Specifically, one such HCI employee who is actively involved in this scheme is Rosetta (last name unknown but believed to be Cutright. For purposes of clarity, this individual is identified herein as "Rosetta."). Rosetta is the primary contact between Healthcare Consortium and Vital Home Healthcare, Physician Care Services and MPI.

38.     On September 26, 2012, Rosetta was reached by calling Management Principles, Inc whose number is 708-342-7082. During the call, Rosetta stated that she works with the Department of Aging and helps seniors obtain doctors and nursing visits at home. Rosetta further explained that MPI works with both the Healthcare Consortium, Inc., and the Department of Aging in order to find physicians and nurses for patients.   On September 27, 2012, Rosetta was again reached by phone by calling Management

Principles, Inc whose number  is 708-342-7082.  In that conversation, Rosetta spoke about the "the services that we offer" and explained that MPI would arrange patient services - i.e., "doctor will come out once a month and nurse once a week" the patient. When asked, she further advised that the nurse that would come out would be from "Vital Home Health." Thereafter, she advised that the Vital nurses come out and monitor the patients' medications to make sure they are taking the right medications.  Further, the nurse will take vital signs from the patient when asked, she advised that the physician would come from PCS and specifically that a Dr. Neumann would be the attending physician. She explained that the doctor comes out once a month and will determine whether or not the patient needs a change in medication or different dosages.  She further indicated that they would bring in a physical therapist if the patient had any arthritis. Further, she advised that if the patient said their "side was hurting" they could bring in an "x-ray technician" to do an x-ray of her.  She acknowledged that the doctor that would be providing the service would work with a pharmacy called "Crescent Pharmacy." Later, she advised that MPI could set us up with "their" durable medical equipment company and finally, that there was never a need to bring a patient to the office because MPI "will bring the doctor to you."  Rosetta made if very clear that "Medicare" would be paying for all of these services.  She then explained that Part B Medicare pays for the doctor to come out and see her and Part A pays for the nurses to come out and see her.  She stated that a patient would remain eligible to receive these services "for as long as she wants the service." See also stated that "Medicare is the one telling us" to provide these services. She then went on to cite and article in the Chicago tribune that referenced this "service." She further stated that MPI "...work[s] with the Department of Aging" and advised that

she gets patients' information through a "summary request" and advised that she calls patients and states that they "work with the Department of aging." She further stated that the Department of Aging "sends [MPI] information from time to time." She further advised that typically a case manager will come out and assess needs and completes paperwork and determines the need for housekeeping. However, she advised that she was the one who then does the "medical." Finally, Rosetta indicated that only patients with straight Medicaid would be eligible and may not be eligible if the patient was part of an HMO.

39.    On September 28, 2012 Rosetta was also reached by calling Physician Care Services by dialing 708-429-7039. After the number rang, the person who answered the phone answered it as "Physician Care Services." When asked to speak to "Rosetta," the call was placed on hold and within a minute, Rosetta picked up the phone. During the call, Rosetta stated she works for MPI, PCS and HCI. Specifically, she stated that she works part-time at the Healthcare Consortium's office between 8:30 and 2 each day (other than Wednesday). She explained, while there, she obtains the information for potential referrals of patients. She was unclear whether she was actually an employee there, but stated that she did not have a direct line but just sat "wherever she could" at their office. However, Rosetta can be reached by calling MPI's number or Physician Care Services' number.

40.    Finally, October 9, 2012, Rosetta was also reached by calling Vital Home and Healthcare, Inc. at 708-342-7076. After an introductory message, when asked to speak to "Rosetta" the call was placed on hold and transferred to Rosetta's voicemail message at MPI. Therefore, Rosetta can be reached at "MPI" (i.e., Management Principles, Inc); HCI (i.e.,

13

Healthcare Consortium of Illinois); Vital Home and Healthcare, Inc; and Physicians Care Services and actively works as agent and representative for all three.

41.  Once the list of names and personal information is obtained, the marketing company – MPI -  calls the participants directly to solicit for additional medical services. During the call, the marketer represents that he/she is either *from* the Department of Aging or has received a *referral from* the Department of Aging. While doing so, the MPI marketer has the participant's confidential information which the marketer has obtained from the CCU. By utilizing this information, the marketer is able to connect with the beneficiary on a detailed and informed basis, and thus has an effective means to convince the participant that they are, in fact, eligible for a home physician care and skilled nursing services which would be paid for by Medicare.  These health care services are typically covered by Medicare and, as such, only Medicare eligible participants are contacted by the Marketing Entity.

42.  The MPI marketer then offers to send a physician to the beneficiary's home to perform an assessment and further offers to immediately set up a physicians' appointment for the beneficiary.   If the beneficiary accepts the offer for services, the marketer then transfers the call to the Physician Care intake person (who sits a desk away in the same office space) and that intake person schedules the patient for a doctor visit for purposes of performing the face to face and/or initial assessment for home physician services.  Since the doctor is also affiliated with the fraudulent enterprise, the face to face and assessments nearly always find that the beneficiary is qualified for home health services.

43.     Once the physicians' assessment and face to face of the beneficiary is complete, the patient is submitted to be qualified for the Medicare home health care services.  Upon information and belief, very few, if any beneficiary ever failes to get Medicare services as the doctors who are performing the face to face are affiliated and part of the fraudulent enterprise.

44.     If during these contacts with the MPI marketer, the participant states that he or she has a primary care physician and does not wish to have an in-home physician; the caller obtains permission to contact the patient's primary care physician in order to obtain an authorization for home health services.

45.     The patient's primary care physician is then contacted by the MPI marketer who then and states that they have received a "referral from the Department of Aging" for that primary care physician's patient to receive home health services and will have the primary care physician's office fax back an authorization for the services. Investigation has revealed internal documentation from MPI and HCI showing that it is the explicit written procedure of these entities to state that they have received a referral from the Department of Aging.  In fact, there is no such referral from the Department of Aging. Once services, begin, the organization begins to bill Medicare.

46.     During a period of a few months  in approximately 2009 and/or 2010, Jim Szymanski, presently of Frankfort, Illinois, was employed at Vital as the Director of Marketing. Mr. Szymanski has worked in the home health industry for over 15 years. He was hired directly be Asif Sayeed. After taking the job, Mr. Syzmanski realized almost at once that there were fraudulent practices taking place and he immediately began looking for a new

job. While there, he learned that Vital was routinely being given access to the confidential client files of Healthcare Consortium of Illinois ("HCI"), in order to "cherry pick" all potential home health clients, with a focus on those who could be signed up for services that would be most profitably reimbursed through Medicare. Mr. Szymanski confirms that Vital made payments in the form of gift cards and meals to HCI's case manager in exchange for the access to the confidential files. Specifically, a co-worker of Mr. Szymanski at Vital, Alice Piwowarski, would go to HCI on a weekly basis, with gift cards given to her by Asif Sayeed. Ms. Piwowarski would then exchange these cards for medical information that would later be taken and used to solicit skilled home health care referrals.

47.   Alice Piwowarski, resides in Worth, Illinois. Ms. Piwowarski has worked in the home health industry for over 20 years, and during that time worked for Vital for several years. Her tenure of employment at Vital overlapped the months when Mr. Szymanski was employed at Vital. Ms. Piwowarski personally delivered gift cards to case managers at HCI and was given access to HCI's confidential files. She stated that she was aware that this practice continued after she had left Vital. She identified Ella Gray and Joe English as two supervisors at HCI that were aware of this unlawful exchange of healthcare information for gift cards. Ms. Piwowarski stated that the person with the most information regarding these practices was Denise Thomas. Denise Thomas is the former Marketing Director of Physician Care.

**VII.   <u>Specific Instance</u>**

48.   A specific example of the scheme described above in action is as follows.

49.     On April 19, 2011, HCI received a referral from the Department or Aging for a Mr. Mikeolene Williams who lives in the City of Chicago.  The last four digits of Mr. Williams social security number are 6333.  Mr. Williams was a Medicare beneficiary.  HCI Care Coordinator, Akira Syndor, performed an assessment on May 2, 2011.

50.     Mr. Williams' information (and presumably his assessment) was received by MPI from HCI on May 5, 2011.

51.     On that same date, May 5, 2011, a marketer from MPI contacted Mr. Williams and spoke with him.  During this conversation, it was learned that Mr. Williams did have a homemaker, from an organization called Help at Home, who was at Mr. Williams' home five days a week.

52.      However, during the conversation, Mr. Williams was advised by the MPI marketer that he was eligible for a home physician that would come to his home and provide services.  Mr. Williams agreed and immediately following a doctor from Physician Care went to his home to perform for an assessment.  That doctors was Allen Neumann who performed that home assessment on May 9, 2011.   During that assessment, Dr. Neumann wrote an authorization for home health services which was then provided to Vital.

53.     Vital began its services on May 17, 2011.

54.      Since May 17, 2011, Mikeolene Williams has been receiving monthly home physician visits from Physician Care and weekly skilled nursing services from Vital.  All of these services have been submitted by Defendants for payment to, and paid for by, Medicare.

55.     It is believed that the practice described herein has been going on since December 2010 with approximately 3000 participant contacts as above as of the filing of this action Although it cannot be determined with certainty, all patients were initially referred to Physician Care for home services.  The number of patients who actually received subsequent home physician services from Physician Care cannot be determined; but it is believed to be several hundred patients.

56.     In addition, all Physician Care patients are then referred to Vital for home health services. It has been confirmed that at least 125 patients were obtained by Vital in this fashion - though the actual number is likely greater.  This is an intricate and organized scheme by and between these organizations.

57.     As outlined above, the healthcare and marketing entities' payment of remuneration would constitute an unlawful kickback in violation of  the Anti-Kickback Statute  42 U.S.C. § 1320a-7b(b) ("AKS") and 305 ILCS 5/8A-3(b) of the Illinois Public Aid Code (Vendor Fraud and Kickbacks) 305.

58.     Similarly, the activities of MPI as described herein, violates the Stark Act and Illinois's comparable statute, the Health Care Worker Self-Referral Act, 225 ILCS 47/1 *et seq.* by virtue of MPI's common ownership with Physician Care and Vital.

59.     Finally, the misrepresentation by the marketer entity that it is call "from" or on "behalf of" the Department of Aging also violates laws governing fraudulent conduct and fraudulent misrepresentation.

## <u>COUNT I – FALSE CLAIMS ACT</u>

60.    The allegations set forth in the preceding paragraphs 1-59 are adopted and realleged as if fully set forth herein below.

61.    In order to acquire unearned Medicare funds, Defendants, by and through their officers, agents, and/or employees, engaged in fraudulent activity by submitting, or causing to be submitted, reimbursement claims which it knew to be false to an officer or employee of the United States Government.

62.    The conduct of Defendants as described herein violated the False Claims Act, 31 USC 3729(a)(1).

63.    The United States paid the false and fraudulent claims, resulting in damage to the United States in an amount to be determined at trial.

**WHEREFORE,** Plaintiff, on behalf of itself, individually, and on behalf of the United States Government, respectfully requests this Court to award the following relief:

(a) That this Court Order that Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729;

(b) That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States Government has sustained because of Defendants actions, plus a civil penalty of five Thousand Dollars ($5,000.00) to Ten Thousand Dollars ($10,000.00) for each action in violation of the False Claims Act, and the costs of this action, with interest, including the costs of the United States Government for its expenses related to this action;

(c) The Plaintiff be awarded all costs incurred, including reasonable attorneys' fees;

(d) That, in the event that the United States Government does not proceed with this action, Plaintiff be awarded an amount that this Court decides is reasonable for collecting the civil

penalty and damages, which shall not be less than twenty- five percent (25%), nor more than thirty percent (30%), of the proceeds of the action or settlement;

(e) That a trial by jury be held on all issues; and

(f) That the United States Government and Plaintiff receive any other relief, both at law and in equity, to effectuate the purposes of the False Claims Act or to which they may otherwise reasonably be entitled.

## COUNT II

### SERVICES IN VIOLATION OF ANTI-KICKBACK STATUTES
### RESULTING IN FALSE CLAIMS

64.     The allegations set forth in the preceding paragraphs 1-63 are adopted and realleged as if fully set forth herein below.

65.     The United States Code,  42 USC §1320A-7B(b)(2) provides that it is a felony criminal violation of Federal law to "knowingly and willfully offer[] or pay[] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program". That section also provides that actual knowledge or specific intention to commit a violation of that section is not required for a violation to occur.

66.    In addition to the criminal proscription of such conduct, 42 USC §1320A-7B provides that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of title 31," more commonly known as the False Claims Act.

67.    On information and belief, Defendants have, and continues to be, engaged in ongoing and repeated violations of the prohibition on kickbacks in connection with referrals of patients for home health services.

68.    Pursuant to 42 USC §1320A-7B, all claims submitted by Defendants for services performed for patients whose relationship with Defendants is a result of an illegal referral kickback, even services otherwise actually legitimately provided and properly documented, are violative of the False Claims Act.

69.    Defendants, by and through its officers, agents, and/or employees, engaged in fraudulent activity by submitting, or causing to be submitted, reimbursement claims were a result of illegal kickback schemes.

70.    The conduct of Defendants as described herein violated the False Claims Act, 31 USC 3729(a)(1) and the provisions of 42 USC §1320A-7B.

71.    The United States paid the false and fraudulent claims submitted by Defendants in violation of the False Claims Act, 31 USC 3729(a)(1) and the provisions of 42 USC §1320A-7B, resulting in damage to the United States in an amount to be determined at trial.

**WHEREFORE,** Plaintiff, on behalf of itself, individually, and on behalf of the United States Government, respectfully requests this Court to award the following relief:

(a) That this Court Order that Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729 in conjunction with of 42 USC §1320A-7B;

(b) That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States Government has sustained because of Defendants actions, plus a civil penalty of Five Thousand Dollars ($5,000.00) to ten Thousand Dollars ($10,000.00) for each action in violation of the False Claims Act, and the costs of this action, with interest, including the costs of the United States Government for its expenses related to this action;

(c) The Plaintiff be awarded all costs incurred, including reasonable attorneys' fees;

(d) That, in the event that the United States Government proceeds with this action, that Plaintiff be awarded at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, plus an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs;

(e) That, in the event that the United States Government does not proceed with this action, Plaintiffs be awarded an amount that this Court decides is reasonable for collecting the civil penalty and damages, which shall not be less than twenty- five percent (25%), nor more than thirty percent (30%), of the proceeds of the action or settlement;

(f) That a trial by jury be held on all issues; and

(g) That the United States Government and Plaintiff receive any other relief, both at law and in equity, to effectuate the purposes of the False Claims Act or to which they may otherwise reasonably be entitled.

## COUNT III

## ILLINOIS' FALSE CLAIMS ACTS

72.     The allegations set forth in the preceding paragraphs 1-71 are adopted and realleged as if fully set forth herein below.

73.     This Count is brought pursuant to the Illinois False Claims Act, 740 ILCS 175/1 *et seq.* and pursuant to this Court's jurisdiction as explained, *supra*.

74.     The Illinois False Claims Act, 740 ILCS 175/3, provides that "In general, any person who: (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or] (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;…is liable to the State for a civil penalty of not less than $5,500 and not more than $11,000, plus 3 times the amount of damages which the State sustains because of the act of that person."

75.     The Illinois False Claims Act, 740 ILCS 175/4(b), provides that "Actions by private persons. (1) A person may bring a civil action for a violation of Section 3 for the person and for the State. The action shall be brought in the name of the State."

76.     Defendants have made, and continue to make, false and fraudulent claims for payments by the State of Illinois through the Medicaid program as described herein, in violation of the Illinois False Claims Act and as stated in the above paragraphs.

   **WHEREFORE,** Plaintiff, on behalf of and in the name of the State of Illinois, respectfully requests this Court to award the following relief:

(a) That this Court Order that Defendants cease and desist from violating the Illinois False Claims Act;

(b) That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Illinois has sustained because of Defendants actions, plus a civil penalty of Five Thousand Five Hundred Dollars (5,500.00) to Eleven Thousand Dollars ($11,000.00) for each action in violation of the Illinois False Claims Act, and the costs of this action, with interest, including the costs of the State of Illinois for its expenses related to this action;

(c) The Plaintiff be awarded all costs incurred, including reasonable attorneys' fees;

(d) That, in the event that the State of Illinois  proceeds with this action, that Plaintiffs be awarded at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim;

(e) That, in the event that the State of Illinois does not proceed with this action, Plaintiffs be awarded an amount that this Court decides is reasonable for collecting the civil penalty and damages, which shall not be less than twenty- five percent (25%), nor more than thirty percent (30%), of the proceeds of the action or settlement;

(f) That a trial by jury be held on all issues; and

(g) That the State of Illinois and Plaintiff receive any other relief, both at law and in equity, to effectuate the purposes of the Illinois False Claims Act or to which they may otherwise reasonably be entitled.

Respectfully submitted by:


  _/s/ Christopher D. Willis_____
Christopher D. Willis, attorney for
Plaintiff

BUSSE, BUSSE, & GRASSÉ, P.C.
20 N. Wacker Drive, Suite 1363
Chicago, Illinois 60606
(312)750-1212
FAX(312)750-1211
ARDC No.: 6294094
cwillis@bussepc.com