UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STOP ILLINOIS HEALTH CARE FRAUD, LLC, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> ASIF SAYEED, PHYSCAN CARE ) <br> SERVICES, S.C., MANAGEMENT ) <br> PRINCIPLES, INC., and VITAL HOME & ) <br> HEALTHCARE, INC., ) <br> ) <br> Defendants. ) | Case No. 12-cv-09306 <br><br> Judge Sharon Johnson Coleman |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Stop Illinois Health Care Fraud, LLC brought this *qui tam* case pursuant to the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* The plaintiff alleges that defendants violated the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, the False Claims Act, and the Illinois False Claims Act, 740 ILCS 175/1, *et seq.* The United States and the State of Illinois did not intervene in the action, and plaintiff filed its Third Amended Complaint on September 22, 2016. Plaintiff alleges that the defendants paid a community care organization, Healthcare Consortium of Illinois ("HCI"), to give defendants information on clients that HCI had evaluated for eligibility for programs by the Illinois Department of Aging, so that defendants could then market Medicare reimbursed healthcare services to those clients. In their amended answer to the third amended complaint, defendants included a safe harbor affirmative defense under 42 C.F.R. § 1001.952(d).

The Court held a bench trial on July 22–24, 2019. After plaintiff presented its case in chief before the Court, defendants filed a motion for a directed finding on all claims, arguing that plaintiff failed to satisfy a prima facie case of an Anti-Kickback Statute violation. The Court granted the motion and plaintiff appealed to the Seventh Circuit Court of Appeals. On April 29, 2020, the

1

Seventh Circuit reversed this Court's decision and remanded the case for further proceedings, specifically to revisit whether plaintiff's file-access theory constitutes a referral. The parties agreed to proceed with a renewed motion for a directed verdict, which defendants filed on August 6, 2020. (Dkt. 240.) For the following reasons, defendants' motion is denied.

**Background**

The following constitutes the Court's findings of fact pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. Because the Seventh Circuit vacated this Court's decision only as to the file-access theory of referrals, the Court will not address the evidence presented on the theory that gift cards were used to solicit referrals.

Defendant Asif Sayeed wholly owns the defendant Management Principals, Inc. ("MPI"). MPI arranges medical referrals to other entities and advertises itself as a "one stop shop," managing a variety of healthcare companies, including the defendants Vital Home & Healthcare, Inc. ("Vital Home") and Physician Care Services, S.C.

HCI was a non-governmental organization that coordinated services for low-income seniors. The primary function of HCI's senior program included sending case managers (later referred to as care coordinators) to meet with senior clients and survey their needs for access to a range of community offerings, such as "Meals on Wheels" and medical services, that would enable the seniors to remain in their own housing longer. HCI referred clients who needed and desired in-home healthcare to MCI on a rotating basis, such that each agency that qualified for the referral would receive a distribution of the referrals.

HCI and MCI entered into a management services agreement effective December 1, 2010. HCI's attorney Robert Spadoni primarily drafted and made revisions to the agreement, which Sayeed negotiated with Spadoni. HCI's Chief Program Officer at that time, Ella Grays, was also aware of the discussions. Sayeed testified that the parties entered into the agreement because MPI was

looking to become an Accountable Care Organization ("ACO"), which required enrolling 5,000 Medicare recipients as patients. Sayeed believed the company could rely on HCI records to find those patients by "data mining" HCI's files.

Pursuant to the agreement, MPI paid HCI $5,000 monthly for the 18-month length of the agreement in exchange for HCI's administrative advice and counsel. As part of the agreement, MPI sought to utilize HCI's staff to provide certain management services needed in connection with MPI's Consulting Services Program. HCI was required to appoint Associate Managers, who in addition to completing their duties were also obligated to provide written reports of their activities.[1] Whether Associate Managers ever fulfilled these duties is at best unclear. Sayeed testified that he never saw a report created by an Associate Manager and could not name anyone acting as an Associate Manager. Sayeed additionally testified that the purpose of the agreement was for HCI to give MPI access to its files so that MPI could perform data mining. He testified that HCI did not provide data reports to MPI, but rather gave MPI access to the raw data, which MPI compiled and analyzed itself. Sayeed testified that its $5,000 per month payments went toward paying for the raw data and also for HCI staff being available to answer questions in person and over the phone. Although the agreement is somewhat vague on this point, it does not explicitly contemplate MPI's access to HCI's raw data.

Sayeed also testified that he believes that the agreement gave MPI the right to solicit HCI clients for health care services by calling them. He testified that MPI did so after consulting with their attorney, Robert Spadoni, who indicated making calls using the data received from HCI was permitted under the agreement. The agreement does not explicitly contemplate client solicitations. Sayeed testified that the purpose of the agreement was ultimately to "help seniors." He testified that

---

[1] Relator John Mininno testified that the payments made under the agreement represented some kind of kickback, without offering specifics as to what represented a kickback and how the practice was improper.

if MPI called a client whose contact information they obtained from HCI's records and that person did not have a doctor or could not travel to one, MPI would send a doctor from its sister organization to them. MPI did the same thing for clients needing in-home nursing.

Rosetta Cutright (also known as Rosetta Cutright Woods), who worked at MPI for about a year in 2012 and then at HCI from approximately 2013 to November 2018, testified about her role in MPI's data mining and client solicitation. She testified that three times per week, she went to HCI and read client files, wrote down the type of diagnosis they had, their insurance, and contact information. After obtaining this data, Cutright went back to MPI's office and a doctor reviewed her findings, telling her which clients she should call to see if they needed additional medical services.

Ella Grays, a former HCI supervisor who was not involved in the negotiation of the agreement, testified that she understood the purpose of the agreement was for MPI to assist HCI by identifying major needs of clients in the community and HCI could then write grants asking for funding to that end. On HCI's end, she understood that it would make referrals to MPI of clients who required services and were not yet referred out to someone else. Grays testified she did not know why MPI was paying HCI $5,000 per month and was not aware of any staff member spending time working on behalf of MPI under the agreement.

Over the course of eighteen months, MPI paid HCI a total of $90,00. Sayeed testified HCI continued to give MPI access to its clients' information even after the agreement was no longer in effect.

Several witnesses testified that they were not aware of defendants ever offering any money or anything of value directly for the purpose of receiving a referral. This includes Rosetta Cutright and Alice Piwowarski, who worked for Vital Health from approximately 2005 to 2011. In its case in chief, however, plaintiff put forth a less direct theory of referral. Plaintiff argued that MPI's

4

payments under the agreement were intended to secure access to the client information in the HCI files that it then used to place solicitation calls. The Court will refer to this theory as the "file access theory" of referral. In its decision, the Seventh Circuit framed the central question for consideration as whether this arrangement could constitute a prohibited referral under the Anti-Kickback Statute.

**Legal Standard**

Because the Court held a bench trial, the Court construes defendants' motion as a Rule 52(c) motion for judgment on partial findings, rather than as a motion for a directed verdict. *See* Fed. R. Civ. P. 52(c). Pursuant to Rule 52(c), if a party has been fully heard on an issue during a bench trial and the Court finds against the party on that issue, the Court may enter judgment against the party on a claim that can be maintained "only with a favorable finding on that issue." Fed. R. Civ. P. 52(c). On a Rule 52(c) motion, the Court is "acting in the capacity of a finder of fact, weighing evidence and assessing the credibility of the witnesses." *Pinkston v. Madry*, 440 F.3d 879, 890 (7th Cir. 2006). Judgment on partial findings should be granted only if the Court could only find against the party. *See Wilborn v. Ealey*, 881 F.3d 998, 1008 (7th Cir. 2018).

**Analysis**

The following constitutes the Court's conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

The purpose the Anti-Kickback Statute is to avoid Medicare and Medicaid fraud. *See United States v. Patel*, 778 F.3d 607, 612 (7th Cir. 2015). To prevail on its Anti-Kickback Statute claim, plaintiff must prove by a preponderance of the evidence: (1) the offer or payment or the causing of any offer or payment of remuneration; (2) part of the purpose of which was to induce any person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program; (3) that those items or services were paid for in whole or in part by a Federal health care program; and

5

(4) that the purposeful inducement in element two was knowing and willful. 42 U.S.C. § 1320a-7b. Any claim for items or services for which payment may be made in whole or in part under a Federal health care program that includes items or services resulting from a violation of the Anti-Kickback Statute also constitutes a false or fraudulent claim under the False Claims Act. *See* 42 U.S.C. § 1320a-7b(g). This applies equally to the Illinois False Claims Act, as Illinois courts interpreting the state law look to interpretations of the similarly worded federal False Claims Act. *See, e.g., People ex rel. Levenstein v. Salafsky*, 338 Ill.App.3d 936, 943, 789 N.E.2d 844 (2d Dist. 2003). Thus, plaintiff must prove a prima facie violation of the Anti-Kickback Statute in order to succeed on any of its claims before this Court.

The first question the Court must answer is whether the client information HCI provided to MPI, which MPI used to solicit clients, is considered a referral under the Anti-Kickback Statute. In considering the definition of "refer," the Seventh Circuit has highlighted the need for an expansive definition, noting "a narrow definition of the term would defeat the central purposes of the Anti–Kickback Statute." *United States v. Patel*, 778 F.3d 607, 616 (7th Cir. 2015). On appeal from this Court's decision, the Seventh Circuit noted that this case is not exactly the same as the situation in *Patel*, where a doctor was acting as a gate keeper to referrals, while here an organization, HCI, was playing that role. The court explained, however, that the lessons from *Patel* remain—the definition of a referral under the Anti-Kickback Statute is broad and includes both "direct and indirect means of connecting a patient with a provider." *Stop Illinois Health Care Fraud, LLC v. Sayeed*, 957 F.3d 743, 750 (7th Cir. 2020). In its decision the court went on to say that a referral "goes beyond explicit recommendations to include more subtle arrangements. And the inquiry is a practical one that focuses on substance, not form." *Id.*

Defendants make several arguments in their renewed motion for a directed verdict, but do not address the indirect referral theory, or file access theory, head-on. Defendants rely on testimony

6

about there never having been instances of remuneration from MPI in exchange for a direct referral to make their case. They highlight testimony from Ella Grays to demonstrate that referrals were only made to home health agencies on a rotating basis. They additionally rely on testimony of Rosetta Cutright Woods, who testified that no one at MPI nor HCL suggested that she refer extra patients to MPI. The Court agrees that there is no testimony supporting the theory that MPI paid anyone at HCI for direct referrals—either with gift cards or anything else of value. That, however, is not the question for consideration on remand from the Seventh Circuit. The Court must consider where the payments made under the management agreement were given in exchange for indirect referrals MPI gained through access to client files, which MPI used to solicit clients.

Defendants insist that the MPI's intent of the agreement was to investigate the feasibility of becoming an ACO, not to obtain referrals. Defendants concede that they did indeed solicit clients using the data they received from HCI, but that they received much more data than contact information on these clients, illustrating that they were not only paying for client contact information but were investigating whether to become an ACO. That MPI used the client data for more than just soliciting clients does not somehow eliminate the possibility off this being a referral. Additionally, Defendants argue that the clients they solicited were seniors that MPI has passed over, which should not be considered a referral because it was akin to soliciting clients from a public listing. MPI's solicitation of HCI clients was in fact not at all like contacting people from a public listing because they had private access to those client files—no other organization could access that data.

Defendants' remaining arguments are not especially helpful to the Court in resolving its mandate from the Seventh Circuit. Again, remuneration for direct referrals is not at issue here. As the Seventh Circuit outlined in their decision in this case, the analysis regarding whether something constitutes a referral is a practical one that focuses on substance, not form. Here, HCI gave MPI

7

access to client files that contained client contact information. MPI then used that contact information to solicit those clients and sign them up for services that were funded by Medicare. Substantively, this would have been the same outcome if HCI had directly referred those clients to MPI's services. Accordingly, after reconsidering the evidence before it with guidance from the Seventh Circuit, the Court finds that giving MPI access to client contact information that was used to solicit those clients should be classified as a referral under the Anti-Kickback Statute.

Next, the Court must determine whether the fee MPI paid pursuant to the management agreement was intended as renumeration for the referrals. Defendants argue that the intent of the agreement was for MPI to gain access to data that would help it determine whether it would become an ACO. Defendants also argue that their point is buttressed by the fact that when MPI determined not to pursue becoming an ACO and stopped making the payments, HCI continued to share its data containing client contact information, so the payments could not have been intended for the referrals. If the Court finds that the fees under the agreement constituted renumeration for a referral under the Anti-Kickback Statute while they were being paid, any action by the parties after the fact does not vitiate that wrong-doing. Moreover, even if the primary motivation of MPI was to gain insight into the feasibility of becoming an ACO, it will still be liable under the Anti-Kickback Statute if the payments were even partly intended as compensation for past or future referrals. *See United States v. Borrasi*, 639 F.3d 774, 782 (7th Cir. 2011).

Defendants have asserted a safe harbor affirmative defense pursuant to 42 C.F.R. § 1001.952, which is a set of regulations promulgated by the United States Department of Health and Human Services. These regulations specify various circumstances under which a financial relationship between a provider and a referral source would not give rise to liability under the Anti–Kickback Statute. *See* 42 C.F.R. § 1001.952. An affirmative defense must be proven by defendants, and they have not had an opportunity to present evidence yet.

Plaintiff argues that the agreement does not fall under the safe harbor because it was a sham, where none of HCI's duties contemplated in the agreement were performed, including reports that should have been created by Associate Managers. Sayeed testified that he never saw a report created by an Associate Manager and could not name anyone working in that role. Ella Grays testified that she was not aware of any staff member spending time working on behalf of MPI pursuant to the agreement. The Court will reserve findings on the issue of renumeration and the safe harbor until defendants have had an opportunity to present their evidence at a bench trial.

**Conclusion**

For the foregoing reasons, the renewed motion for a directed verdict is denied [240] and the parties shall proceed with the defendants' case at a bench trial.

IT IS SO ORDERED.

Date: November 24, 2020  Entered: _____
SHARON JOHNSON COLEMAN
United States District Judge