# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| STOP ILLINOIS HEALTH CARE FRAUD, LLC, | ) |
| | ) Case No. 12-cv-09306 |
| Plaintiff, | ) |
| | ) Judge Sharon Johnson Coleman |
| v. | ) |
| | ) |
| ASIF SAYEED, PHYSICIAN CARE SERVICES, S.C., MANAGEMENT PRINCIPLES, INC., and VITAL HOME & HEALTHCARE, INC., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Stop Illinois Health Care Fraud, LLC brought this *qui tam* case pursuant to the False Claims Act, 31 U.S.C. §§ 3729, *et seq*. The plaintiff alleges that defendants violated the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, the False Claims Act, and the Illinois False Claims Act, 740 ILCS 175/1, *et seq*. The United States and the State of Illinois did not intervene in the action. Plaintiff filed its Third Amended Complaint on September 22, 2016, alleging that the defendants paid a community care organization, Healthcare Consortium of Illinois ("HCI"), to give defendants information on clients that HCI had evaluated for eligibility for programs by the Illinois Department of Aging, so that defendants could then market Medicare reimbursed healthcare services to those clients. Defendants included a safe harbor affirmative defense under 42 C.F.R. § 1001.952(d) In their amended answer to the third amended complaint, meaning that they would be shielded from liability even if their conduct violated the Anti-Kickback Statute.

The Court held a bench trial on July 22–24, 2019. After plaintiff presented its case in chief before the Court, defendants filed a motion for a directed finding on all claims, arguing that plaintiff failed to satisfy a prima facie case of an Anti-Kickback Statute violation. The Court granted the

1

motion and plaintiff appealed to the Seventh Circuit Court of Appeals. On April 29, 2020, the Seventh Circuit reversed this Court's decision and remanded the case for further proceedings, specifically to revisit whether plaintiff's file-access theory constitutes a referral. The Court denied a renewed motion for a directed verdict and held a bench trial on February 22, 2021. For the following reasons, the Court finds that defendants violated the Anti-Kickback Statute and the safe harbor defense does not apply.

**I.    Background**

The Court presumes familiarity with its prior rulings. The following constitutes the Court's findings of fact pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. Because the Seventh Circuit vacated this Court's decision only as to the file-access theory of referrals, the Court will not address the evidence presented on the theory that gift cards were used to solicit referrals.

Defendant Asif Sayeed wholly owns the defendant Management Principals, Inc. ("MPI"). MPI arranges medical referrals to other entities and advertises itself as a "one stop shop," managing a variety of healthcare companies, including the defendants Vital Home & Healthcare, Inc. ("Vital Home") and Physician Care Services, S.C. HCI was a non-governmental organization that coordinated services for low-income seniors. The primary function of HCI's senior program included sending case managers (later referred to as care coordinators) to meet with senior clients and survey their needs for access to a range of community offerings, such as "Meals on Wheels" and medical services, that would enable the seniors to remain in their own housing longer. HCI referred clients who needed and desired in-home healthcare to MCI on a rotating basis, such that each agency that qualified for the referral would receive a distribution of the referrals.

HCI and MCI entered into a management services agreement ("MSA") effective December 1, 2010. HCI's attorney Robert Spadoni primarily drafted and revised the agreement, which Sayeed negotiated with Spadoni. HCI's Chief Program Officer at that time, Ella Grays, was also aware of

the discussions. Sayeed testified that the parties entered into the agreement because MPI was looking to become an Accountable Care Organization ("ACO"), which required enrolling 5,000 Medicare recipients as patients. Sayeed believed the company could rely on HCI records to find those patients by "data mining" HCI's files.

Pursuant to the agreement, MPI paid HCI $5,000 monthly for the 18-month length of the agreement in exchange for HCI's administrative advice and counsel. As part of the agreement, MPI sought to utilize HCI's staff to provide certain management services needed in connection with MPI's Consulting Services Program. HCI was required to appoint Associate Managers, who in addition to completing their duties were also obligated to provide written reports of their activities. Whether Associate Managers ever fulfilled these duties is unclear from the evidence presented. Sayeed testified that he never saw a report created by an Associate Manager and could not name anyone acting as an Associate Manager. Sayeed additionally testified that the purpose of the agreement was for HCI to give MPI access to its files so that MPI could perform data mining. He testified that HCI did not provide data reports to MPI, but rather gave MPI access to the raw data, which MPI compiled and analyzed itself. Sayeed testified that its $5,000 per month payments went toward paying for the raw data and for HCI staff being available to answer questions in person and over the phone. The agreement did not explicitly mention MPI's access to HCI's raw data.

Sayeed also testified that he believes that the agreement gave MPI the right to solicit HCI clients for health care services by calling them. He testified that MPI did so after consulting with their attorney, Spadoni, who indicated that making calls using the data received from HCI was permitted under the agreement. The agreement does not explicitly provide for client solicitations. Sayeed testified that the purpose of the agreement was ultimately to "help seniors." He further testified that if MPI called a client whose contact information they obtained from HCI's records and that person did not have a doctor or could not travel to one, MPI would send a doctor from its

3

sister organization to them. MPI did the same thing for clients needing in-home nursing. Over the course of eighteen months, MPI paid HCI a total of $90,000. Importantly, Sayeed testified HCI continued to give MPI access to its clients' information even after the agreement was no longer in effect.

Rosetta Cutright (also known as Rosetta Cutright Woods), who worked at MPI for about a year in 2012 and then at HCI from approximately 2013 to November 2018, testified about her role in MPI's data mining and client solicitation. She testified that three times per week, she went to HCI and read client files, wrote down the type of diagnosis they had, their insurance, and contact information. After obtaining this data, Cutright went back to MPI's office and a doctor reviewed her findings, telling her which clients she should call to see if they needed additional medical services.

Ella Grays, a former HCI supervisor who was not involved in the negotiation of the agreement, testified that she understood the purpose of the agreement was for MPI to assist HCI by identifying major needs of clients in the community and HCI could then write grants asking for funding to that end. She further testified that HCI would make referrals to MPI of clients who required services and were not yet referred out to someone else. Grays also stated she did not know why MPI was paying HCI $5,000 per month and was not aware of any staff member spending time working on behalf of MPI under the agreement.

Several witnesses, including Cutright, testified that they were not aware of defendants ever offering any money or anything of value directly for the purpose of receiving a referral. In its case in chief, however, plaintiff put forth a less direct theory of referral. Plaintiff argued that MPI's payments under the agreement were intended to secure access to the client information in the HCI files that it then used to place solicitation calls. The Court will refer to this theory as the "file access

4

theory" of referral. In its decision, the Seventh Circuit framed the central question for consideration as whether this arrangement could constitute a prohibited referral under the Anti-Kickback Statute.

Defendants brought a renewed motion for a directed verdict after the Seventh Circuit issued its opinion and argued that there was never any remuneration for direct referrals. But the Court noted in its denial of defendants' motion that the question on remand concerned indirect referrals under the file access theory, not direct referrals. The Court concluded that "giving MPI access to client contact information that was used to solicit those clients should be classified as a referral under the Anti-Kickback Statute." Opinion on Renewed Motion for Directed Verdict, pg. 8. The remaining issues for the 2021 trial were (1) whether the fees were intended as remuneration for the referrals, which would result in liability, and (2) whether an affirmative defense applies. At the 2021 trial, plaintiff presented no additional evidence and defendants presented Sayeed as its only witness. Sayeed's testimony largely rehashed arguments the Court previously rejected and veered into irrelevant details. Sayeed offered limited additional insight on the file access theory of referral or the safe harbor affirmative defense.

**II.     Analysis**

To prevail on its Anti-Kickback Statute claim, plaintiff must prove by a preponderance of the evidence: (1) the offer or payment or the causing of any offer or payment of remuneration; (2) part of the purpose of which was to induce any person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program; (3) that those items or services were paid for in whole or in part by a Federal health care program; and (4) that the purposeful inducement in element two was knowing and willful. 42 U.S.C. § 1320a-7b. In its denial of defendant's renewed motion for a directed verdict, the Court already found that plaintiff's file access theory was legitimate and that accessing the client information constituted a referral. After hearing the defense

case, the Court must next determine "whether the fee MPI paid pursuant to the management agreement was intended as renumeration for the referrals." *Id.* If there was intent, defendants are liable under the Anti-Kickback Statute and the Court must then evaluate defendant's affirmative defense.

The Court must first consider whether the fees under the MSA were intended as renumeration for a referral. If the fees were even partially intended as renumeration for referrals, defendants would be liable under the Anti-Kickback Statute. *See United States v. Borrasi*, 639 F.3d 774, 782 (7th Cir. 2011). Sayeed testified in the original 2019 trial that the $5,000 per month fee was intended for MPI's access to the raw client data and to ask the HCI staff questions. Since the Court previously ruled that giving MPI access to client contact information that was used to solicit clients constitutes a referral, Sayeed's testimony at trial establishes that the fees were partially intended as renumeration for a referral. Further, Sayeed's 2019 testimony proves that he knowingly and willfully induced HCI to provide referrals (i.e. access to data) in exchange for a $5,000 monthly fee. Because the file access constitutes a referral, the fees were intended as renumeration for the referrals, the services provided were funded by Medicare, and defendant's inducement was knowing and willful, defendants are liable under the Anti-Kickback Statute.

Since defendants' conduct violates the Anti-Kickback Statute, the Court next evaluates whether a safe harbor affirmative defense applies. For the safe harbor defense to apply, defendants must prove by a preponderance of the evidence:

(1) that the agency agreement is set out in writing and signed by the parties

(2) the agency agreement covers all of the services the agent provides to the principal for the term of the agreement and specifies the services to be provided by the agent

(3) if the agency agreement is intended to provide for the services of the agent on a periodic, sporadic or part-time basis, rather than on a full-time basis for the term of the agreement, the agreement specifies exactly the schedule of such intervals, their precise length, and the exact charge for such intervals

> (4) the term of the agreement is for not less than one year
>
> (5) the aggregate compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arms-length transactions, and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid, or other federal healthcare programs
>
> (6) the services performed under the agreement do not involve the counseling or promotion of a business arrangement or other activity that violates any state or federal law; and
>
> (7) the aggregate services contracted for do not exceed those which are reasonably necessary to accomplish the commercially reasonable business purpose of the services.

42 C.F.R. § 1001.952(d). The first and fourth elements are undisputed. The MSA was in writing, signed by the parties, and for 35 months (although MPI ultimately terminated it after 18 months).

The second element, whether the agency agreement covers all the services the agent provides to the principal and specifies those services, is perfunctorily disputed. The testimony of both Sayeed and Cutright proves that the agreement does not define or specify the services provided. Specifically, Sayeed testified that the monthly payment under the MSA was intended for access to the raw client data and that he thought the MSA gave MPI the right to solicit HCI clients. Sayeed attempted to dispute his 2019 testimony on soliciting clients in the 2021 trial, but the Court finds Sayeed's 2021 testimony implausible considering his demeanor, prior testimony, and Cutright's testimony stating the opposite. Cutright testified in 2019 that she did in fact access raw client data and consult with a doctor to determine which clients to solicit for additional medical services.

Based on Sayeed's prior testimony and Cutright's testimony, the Court finds that MPI accessed raw client data and solicited clients using that data. But the MSA does not allow for these services. The MSA specifically lists the services it covers but does not include any reference to accessing client contact information or soliciting clients. *See* Plaintiff's Exhibit 4, Management Services Agreement, pg. 7-8. Additionally, defendants do not argue that the MSA explicitly covers these services. Defendants fail to satisfy the second element of the safe harbor defense requiring the

7

agreement cover the services provided and specify those services. Since the safe harbor defense requires satisfaction of all seven elements, defendants cannot claim it and are liable under the Anti-Kickback Statute, False Claims Act, and Illinois False Claims Act.

### III. Conclusion

For the foregoing reasons, the Court finds defendants violated the Anti-Kickback Statute, False Claims Act, and Illinois False Claims Act, and no affirmative defense applies. Plaintiff is instructed to file supplemental briefing on damages within 21 days. **IT IS SO ORDERED.**

Date: June 8, 2021

Entered: _____
SHARON JOHNSON COLEMAN
United States District Court Judge