# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| STOP ILLINOIS HEALTH CARE FRAUD, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 12-cv-09306 |
| | ) | |
| v. | ) | Judge Sharon Johnson Coleman |
| | ) | |
| ASIF SAYEED, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

As this exceedingly long-running case trundles toward its conclusion, a late-breaking discovery dispute has emerged. On the evening before a scheduled evidentiary hearing, Defendants submitted an exhibit consisting of logs that had not previously been produced. Plaintiff-Relator subsequently moved to strike the non-disclosed documents, as well as their fruits, and to impose appropriate sanctions on Defendants. As it happens, all Parties seem to agree that the un-produced logs are not themselves particularly significant. However, the Court is disturbed by the revelation that Defendants apparently withheld the identities of potential witnesses whom Plaintiffs may have wished to depose, had Plaintiffs known of their potential relevance. As such, the Court grants Plaintiff-Relator's Motion [494]. The Court strikes all documents offered by Defendants that were not disclosed in discovery, including but not limited to docket entry 478-1. The Court will also strike the testimony of Kerry Theodoropoulos from the October 16, 2024 hearing, as well as docket entries 488 and 492. Finally, the Court strikes any oral or written argument concerning damages advanced by Defendants to the extent that it relies upon stricken evidence, including but not limited to applicable portions of Defendants' arguments on October 16, 2024 and applicable portions of docket entries 469, 478, 487, and 497. The Court will impose immediate monetary sanctions on Defendants amounting to 10% of the assessed damages in the Court's earlier Order Concerning Damages (dkt. 282), as well as additional

monetary sanctions in the same amount to be assessed every thirty days after the issuance of this order until the matter of damages has been resolved or the case is otherwise terminated. Finally, in the interests of bringing this case speedily to a conclusion, and to help clarify matters for the Magistrate Judge and the Parties, the Court also makes findings concerning what remains to be decided in this case.

## BACKGROUND

A full recounting of this case's history could fill as many shelves as the printed case materials currently occupy in this Court's chambers. For the purpose of resolving this Motion, the Court will only recite details that are sufficient, but not greater than necessary, to inform the reader about the background of this case.[1]

### I. Defendants' Illegal Scheme and Procedural History

In November 2012, Plaintiff-Relator Stop Illinois Health Care Fraud, LLC brought this *qui tam* case pursuant to the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, against Defendant Asif Sayeed and his healthcare companies. Mr. Sayeed wholly owns Defendant Management Principals, Inc. (MPI), which arranges medical referrals and manages other healthcare companies, including Defendants Vital Home & Healthcare, Inc. (Vital Home) and Physician Care Services, S.C. (Physician Care). Plaintiff-Relator alleged that Defendants paid a community care organization, Healthcare Consortium of Illinois (HCI), to give Defendants information on clients that HCI had evaluated for eligibility for programs by the Illinois Department of Aging. Defendants then marketed Medicare reimbursed healthcare services to the clients they identified. Plaintiffs claimed that this behavior violated the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, the False Claims Act, and the Illinois False

---

[1] For a fuller recounting of this case's history, please consult the Court's prior orders at docket entries 216, 257, and 282, as well as the decisions of the Seventh Circuit, Nos. 19-2635 and 22-3295, which may be found on this docket at entries 234 and 457.

Claims Act, 740 ILCS 175/1, *et seq.* After extensive discovery, multiple motions, and two trials, as well as the Parties' first trip up to the Seventh Circuit—all of which took nearly a decade—the Court found that Defendants violated the laws at issue. Dkt. 257.

In its ordinary course of business, HCI would refer its clients to various providers (including MPI) on a rotating basis, ensuring that each qualifying agency would receive an appropriate distribution of HCI's total referrals. Defendants' illegal scheme stemmed from a "management services agreement" (the Agreement) that HCI and MPI entered effective December 1, 2010. Under the Agreement, MPI paid HCI $5,000 monthly for eighteen months in exchange for, *inter alia*, access to HCI's files for the purpose of data mining. Such access continued even after the eighteen months of payments concluded. MPI sent staff to HCI at least three times a week to read client files and record relevant details, including diagnosis and contact information. The staff would then consult with a doctor at MPI, who would review the data and determine which seniors should be solicited. In effect, the Court found, Defendants paid for access to client data that they then used to circumvent HCI's ordinary rotation of referrals, which violated the Anti-Kickback Statute and the other laws at issue.

The Court assessed damages through reference to a spreadsheet of 673 requests for Medicare payment submitted by Defendants Vital Homes and Physician Care between December 13, 2010 and June 3, 2015. At trial and in subsequent filings, this spreadsheet has been referred to as Exhibit 9. Defendants produced Exhibit 9 in response to an interrogatory asking for all Medicare claims submitted by Defendants for services provided to HCI clients. Because all of the entries postdated the Agreement between HCI and MPI, the Court concluded that each claim was fraudulent. The Court adopted Plaintiffs' calculations of damages (which Defendants did not contest) stemming from each claim, which it then tripled in accordance with the False Claim Act. 31 U.S.C. § 3729(a)(1). The Court also applied the minimum $5,500 per-claim civil penalty required under the False Claims Act.

These calculations resulted in total damages of $3,174,821.58 for the fraudulent claims submitted by Vital Homes and $2,766,150.58 for the fraudulent claims submitted by Physician Care.

On appeal, Defendants contested, *inter alia*, the Court's finding of liability, the constitutionality of its damages award, and the correctness of its damages calculations. The Seventh Circuit rejected almost all of Defendants' arguments, specifically affirming that "Sayeed and his companies knowingly violated the False Claims Act without the protection of a regulatory safe harbor" and that "the $6 million judgment is not constitutionally excessive." *Stop Illinois Health Care Fraud, LLC v. Sayeed*, 100 F.4th 899, 902 (7th Cir., 2024), *cert. denied*, 145 S. Ct. 381, 220 L. Ed. 2d 144 (2024) [hereinafter *Stop Illinois II*]. However, the Seventh Circuit had concerns that some of the entries in Exhibit 9 may have been "provided to patients lawfully referred to the defendants by" HCI, and thus were non-fraudulent. *Id.* at 909. Accordingly, the Appellate Court could not "be confident that Sayeed's challenge to the [calculation of damages] lacks merit." *Id.* The case was remanded back to this Court for the sole purpose of determining "which claims, if any, on the loss spreadsheet (Exhibit 9) were for services provided to patients that [HCI] officially referred to either [Vital Homes or Physician Care] through its standard rotational-referral system." *Id.* at 909–10.

## II. Discovery Dispute

After the Seventh Circuit's remand, the Court scheduled what it hoped would be a "short evidentiary hearing" (dkt. 463) on October 16, 2024 to address the question posed by the Court of Appeals. A week before the hearing, Defendants filed a list of four potential witnesses, none of whom Plaintiffs (or the Court) were previously aware. Dkt. 475. Shortly before midnight on the day prior to the hearing, Defendants filed a brief stating their position on damages. Dkt. 478. Attached as Exhibit A were logs of Vital Homes claims for reimbursement, which Defendants had not disclosed to Plaintiffs during discovery. Dkt. 478-1. Then, at the hearing, Defendants called a witness from the previously filed list, Kerry Theodoropoulos, to authenticate the new logs. However, Defendants failed

to notify the Court of her presence. *See* dkt. 480 at 3–5 [hereafter "Tr."]. Consequently, Ms. Theodoropoulos sat through testimony from Plaintiff-Relator's witness, from which the Court would have excluded Ms. Theodoropoulos if it had known she was in the room. *Id.* at *49–50, 71. As it turned out, Ms. Theodoropoulos had been working for MPI since 2005, well before the start of litigation. *Id.* at *53. Defendants later confirmed that the other three witnesses from Defendants' list (who did not appear at the hearing) were all employees of Vital Homes, and at least one is (or was) a Vital Homes administrator. Dkt. 494-2. Additionally, one of the Vital Homes witnesses, Valerie Roache, appears in a significant number of the entries on the new log that Defendants introduced before the hearing. Dkt. 494 at 6–7 [hereinafter P. Br.]; dkt. 492-2 (unredacted version of dkt. 478-2).

At the conclusion of the hearing, the Court requested new briefs from the Parties concerning their position on damages following Defendants' newly introduced logs. *See* dkts. 486, 487. Plaintiff-Relator then filed the instant motion a few weeks later.

## LEGAL STANDARD

Federal Rule of Civil Procedure 26(a)(1) requires parties, "without awaiting a discovery request," to provide initial disclosures "based on the information then reasonably available to [them]." Fed. R. Civ. P. 26(a)(1)(A), (E). Under Rule 26(e), a party who has made a disclosure under Rule 26(a) or who has responded to an interrogatory must supplement or correct its disclosure or response "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A).

If a party fails to comply with its disclosure obligations under Rule 26(a) or (e), Rule 37(c) generally prohibits the party from using that information "to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The sanction of exclusion is "automatic and mandatory" unless the party can show that its violation was

substantially justified or harmless. *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003). District courts have broad discretion to determine whether a violation of Rule 26(a) or (e) is substantially justified, harmless, or warrants sanctions. *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 514 (7th Cir. 2011) (citing *Caterpillar*, 324 F.3d at 857).

## DISCUSSION

### I.    Motion to Strike

Putting aside the propriety of Defendants' late introduction of evidence, the dispute over these logs has the makings of a tempest in a teapot. Both Parties seem to agree that the logs in question do not provide much in the way of useful information. Plaintiff-Relator is combative in its brief, accusing Defendants of "blatant bad faith" and conducting "trial by ambush." P. Br. at *8, 12. But Plaintiff-Relator also contends that the evidence is meaningless because there has been no substantive testimony to interpret it, and that, in any case, the evidence on its face "does not, in any way, support Defendants' contentions regarding Plaintiffs' Exhibit 9 being comprised solely of rotational referrals." Dkt. 486 at *8. Rather, Plaintiff-Relator asserts that the document, which it says must be excluded, "actually provides substantial, albeit circumstantial, evidence that supports Plaintiff-Relator's position." *Id.* Defendants, for their part, state that they believed that the logs had already been disclosed to Plaintiffs during discovery and argue that the Seventh Circuit's remand permitted the introduction of new evidence. Dkt. 497 at 3, 8–9 [hereinafter D. Resp.]. They also argue, with a fair amount of logical force, that "If Defendants believed that they had a log that supported their position they certainly would not have waited in the hope of a remand to finally introduce it." *Id.* at *4. Nevertheless, Defendants concede that "the Court can strike the evidence and decide the remand issue without it." *Id.* at *11.

The Court's impression, having reviewed the document itself, as well as the Parties' arguments, is that the logs do not contain any significant evidence one way or the other. Nevertheless, Plaintiff-

Relator is correct that Defendants should have produced them during discovery. Defendants provide a variety of reasons why they did not produce the logs, including believing that they were duplicative of previously produced evidence; that Defendants had no reason at the time to believe they were relevant; and that counsel for Defendants may not have known of their existence. D. Resp. at *4–8. All are unavailing. The fact that this Court and the Seventh Circuit invited the Parties to submit new evidence for the October 16, 2024 hearing is not a defense for Defendants' delay in production. The issue here is not really the *newness* of the evidence, but rather its *oldness*. Defendants knew or should have known about the existence and relevance of these logs during discovery, yet they failed to produce them. During a status hearing on May 31, 2017, the Parties discussed the production of intake logs, which were important enough to propose putting all discovery deadlines on hold until such logs were "produced and reviewed." Dkt. 125. It is clear that Defendants were on notice of the need to produce logs of the sort at issue in the instant motion, and their failure to do so, regardless of intentionality, violated the rules of discovery. *See e360 Insight, Inc. v. Spamhaus Project*, 658 F.3d 637, 642 (7th Cir. 2011) (inadvertent violations of discovery rules are still violations).

The Court sees no reason to find that Defendants acted in bad faith in failing to produce these logs. It is possible that Defendants' Rule 26 violation is harmless. Fed. R. Civ. P. 37(c)(1). Both Parties argue as much at various points in their briefs. However, given the very late stage of these proceedings, and the fact that both Parties apparently agree that the Court's exclusion of the logs would be acceptable, the Court will err on the side of caution and grant Plaintiff-Relator's Motion. The logs at issue, in all forms submitted to the Court, will be stricken pursuant to Federal Rule of Civil Procedure 37. The Court will also strike the testimony of Ms. Theodoropoulos at the October 16, 2024 hearing, as well her later affidavit (dkt. 488) and supporting exhibits (dkt. 492). Finally, the Court will strike any argument concerning damages advanced by Defendants to the extent that it relies upon improperly withheld evidence.

## II.    Sanctions

Were this merely a dispute concerning Defendants' non-production of these logs, the Court would not find sanctions appropriate.  The document in question is apparently of almost no significance, and the Court has not seen any evidence suggesting that Defendants withheld the logs as part of some underhanded litigation strategy.  Much more concerning, however, is the revelation that Defendants apparently failed to notify Plaintiffs of the existence of at least four potential witnesses who may have known relevant information about Defendants' claims for reimbursement to Medicare and Medicaid, including the claims in the logs presented in Exhibit 9.  Plaintiff-Relator rightly complains that, had Defendants identified these witnesses and had Plaintiffs been able to depose them, the Seventh Circuit may not have had "uncertainty" concerning the origin of the referrals in Exhibit 9.  P. Br. at *13–14.  In other words, this case could, potentially, have been concluded two years ago. That, of course, is a supposition, and the Court cannot say whether it would have come to pass had these witnesses been identified.  But the lack of knowledge is itself the problem.  The reason we do not know what would have happened is because Defendants broke the rules.

In a Joint Status Report following the Parties' Rule 26(f) Planning Meeting, dated January 18, 2017, the Parties reported that Phase I of discovery would be dedicated to "exchanging information to enable the parties to determine the number of individuals who were provided services by the Defendants which were then billed to Medicare and/or Medicaid for reimbursement, as well as total claims made by Defendants on behalf of such individuals/patients to Medicare and/or Medicaid." Dkt. 110 at *2.  Today, we know that at least Ms. Theodoropoulos and Ms. Roache possessed information that may have aided Plaintiffs in making such determinations.  That may also be true of the other two potential witnesses identified by Defendants prior to the October 16, 2024 hearing, and perhaps even of other people who are still completely unknown.  Defendants had an obligation to provide to Plaintiffs "the names and contact information of people 'likely to have discoverable

information' related to [their] claims." *Morris v. BNSF Ry. Co.*, 969 F.3d 753, 765 (7th Cir. 2020) (quoting Fed. R. Civ. P. 26(a)(1)(A)(i)). As such, the existence of these potential witnesses should have been disclosed to Plaintiffs during discovery. *See King v. Ford Motor Co.*, 872 F.3d 833, 838 (7th Cir. 2017) ("there is obvious prejudice in failing to disclose… a witness during discovery"). And even if Defendants were somehow not initially aware of the relevance of Ms. Theodoropoulos, Ms. Roache, and potentially others, they had an ongoing obligation to supplement their disclosures to include the names of these potential witnesses. Fed. R. Civ. P. 26(e); *see Morris*, 969 F.3d at 766 (timely supplementation under Rule 26(e) "should be a priority—not something brushed off as tedious or unimportant… Parties who do not attend diligently to their obligation to supplement initial disclosures proceed at their own peril.").

Defendants' protestations concerning changes in Plaintiffs' theory of liability are inapposite. D. Resp. at *6–7, 10. Phase I of discovery focused on determining the number of referrals made by Defendants to Medicare and Medicaid. Dkt. 110 at *2. It does not matter which theory of liability was operative at the time because Phase I of discovery went to assessing the potential extent of damages—the very question that remains before this Court. *Id.* Whether Plaintiffs thought at the time that Defendants' kickbacks worked through file access, through distribution of gift cards, or some other theory, the fact remains that Defendants failed to disclose the existence of witnesses who could have aided Plaintiffs in determining the number of referrals made to Medicare and Medicaid, and Defendants further failed to cure their initial omission through supplemental disclosure. Those are gross violations of the rules of discovery, *King*, 872 F.3d at 838, which may have unnecessarily prolonged this case. Defendants, for their part, spend almost no time addressing the issue of their failure to identify potential witnesses, and thus offer no significant defense of their conduct in this respect. *See* D. Resp; *Davis v. Hughes*, No. 3:16-CV-600-MAB, 2025 WL 2732287, at *10 (S.D. Ill. Sept.

25, 2025) ("The burden of establishing substantial justification and harmlessness is on Defendant as the party who is facing the imposition of sanctions." (quoting *Caterpillar*, 324 F.3d at 857)).

When evaluating the severity of a failure to disclose, courts in this Circuit consider the following factors: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *Caterpillar*, 324 F.3d at 857 (citations omitted). The Seventh Circuit formulated these factors in the context of determining sanctions for evidence improperly introduced, rather than for evidence improperly withheld, but they can easily be reconfigured for this issue. Although the Court cannot say for certain the degree to which Plaintiffs may have been prejudiced by Defendants' failure to disclose the names of potential witnesses, there is a reasonable possibility that such disclosure might have settled the damages issue years ago, rather than letting it drag on through appeal and remand. Certainly both Plaintiffs and the Court were quite surprised by Defendants' revelation of the existence of people such as Ms. Theodoropoulos and Ms. Roache, who possessed relevant knowledge but had not been previously disclosed. *See* Tr. at *57–58; P. Br. at 7. There is no real way at this point for Defendants to cure the failure, because the damage in unnecessarily prolonging the case has already occurred. *Cf. Tribble v. Evangelides*, 670 F.3d 753, 760 (7th Cir. 2012), as amended (Feb. 2, 2012) (when reviewing a discovery violation that does not come to light until after appeal, "It's too late to cure the problem"). Similarly, Defendants' failure to disclose obviously cannot, at this point, disrupt the trial. *Id.* However, while the information from these witnesses was not necessary to establish Defendants' liability, the Court's initial decision on damages might have been sufficiently different to obviate the need for the Seventh Circuit's remand. Finally, while the Court saw no real evidence of bad faith in Defendants' failure to produce the logs at issue in Plaintiff-Relator's Motion to Strike, the same cannot be said for Defendants' failure to disclose potential witnesses. There is no conceivable way that Defendants were

unaware of the relevance of Ms. Theodoropoulos, Ms. Roache, and potentially others when discovery Phase I occurred in 2017. *See* Fed. R. Civ. P. 26(a)(1)(E) ("A party must make its initial disclosures based on the information then reasonably available to it.") And even if the failure was inadvertent rather than deliberate, the sheer length of Defendants' failure to disclose or supplement— roughly seven and a half years, longer than the average federal prison sentence[2]—implies significant willfulness in Defendants' actions. *Cf. Morris*, 969 F.3d at 766 (timely supplementation under Rule 26(e) "should be a priority"). All four *Caterpillar* factors weigh in favor of treating this as an acute violation of the rules of discovery, one that demands sanction.

Under Federal Rule of Civil Procedure 37(c)(1)(C), courts may "impose… appropriate sanctions" on a party for failure "to provide information or identify a witness as required by Rule 26(a) or (e)." *See Oyebade v. Bos. Sci. Corp.*, No. 1:11-CV-0968-JMS-DML, 2012 WL 4020971, at *3 (S.D. Ind. Sept. 12, 2012) ("The guiding principle in selecting Rule 37 sanctions is that sanctions must be proportionate to the offense[.]" (citing *Stookey v. Teller Training Distributors*, Inc., 9 F.3d 631 (7th Cir.1993))). Plaintiff-Relator urges the Court to reinstate its damages judgment in full, plus two years of interest. P. Br. at *12. And perhaps that is the sanction Defendants deserve. However, the Seventh Circuit directed this Court to determine whether any of the referrals in Exhibit 9 were legitimate, *Stop Illinois II* at 909–10, and this Court will fulfill that duty. Additionally, reinstating the Court's prior damages award would be, at this stage, akin to dismissal of the case, and the Seventh Circuit has cautioned that dismissal is a "draconian" sanction only justified under the most severe circumstances. *Equal Emp. Opportunity Comm'n v. Wal-Mart Stores E., L.P.*, 46 F.4th 587, 599 (7th Cir. 2022) (quoting *Maynard v. Nygren*, 372 F.3d 890, 892 (7th Cir. 2004)).

---

[2] *See* United State Sentencing Commission, *Statistical Information Packet: Fiscal Year 2024: Seventh Circuit*, 8, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2024/7c24.pdf.

Instead, the Court will impose an immediate monetary sanction on Defendants in an amount equal to 10% of the Court's initial damages judgment. This is necessary to make the People whole after Defendants' prolongation of these proceedings. *Cf. Pable v. Chicago Transit Auth.*, 145 F.4th 712, 722 (7th Cir. 2025) (affirming monetary sanctions for discovery violations where dismissal alone would not have made other party whole); *Olivarez v. GEO Grp., Inc.*, 844 F.3d 200, 206 (5th Cir. 2016) (affirming monetary sanctions where party had no reasonable explanation for failure to make Rule 26 disclosure). For Defendant Vital Homes, a 10% sanction comes to $317,482.16; for Defendant Physician Care, the sanction is $276,615.06. Additionally, the Court will impose continuing sanctions of the same amount on Defendants every thirty days after the issuance of this order until the matter of damages has been resolved or the case is otherwise terminated. If the Parties reach a settlement in principle then further assessments of the continuing sanctions will be stayed pending finalization of the settlement. However, if the Parties ultimately do not reach settlement following such a stay, then any stayed assessments will be applied retroactively.

### III. Clarification of What Remains to Be Decided

On November 20, 2025, the Court referred this case to Magistrate Judge Holleb Hotaling for the purpose of assessing the amount of damages, as well as for settlement discussions, should such discussions occur. Dkt. 507. In the interests of bringing this case speedily to a conclusion, and to clarify for the Magistrate Judge and the Parties what remains to be decided in this case, the Court offers the following findings.

#### A. Liability

At the conclusion of the second trial, this Court found that Defendants' payments to HCI under the Agreement were intended as remuneration for the referrals that Defendants received through their data mining of HCI's files, and that Defendants were therefore liable for violations of the Anti-Kickback Statute, the False Claims Act, and the Illinois False Claims Act. *Stop Illinois Health*

*Care Fraud, LLC v. Sayeed*, No. 12-CV-09306, 2021 WL 2331338, *3, 5 (N.D. Ill. June 8, 2021). Defendants appealed, but the Seventh Circuit affirmed the Court's ruling. *Stop Illinois II* at 909–10. At this point, Defendants cannot contest their liability. However, Defendants seem to misunderstand the lay of the land following the Seventh Circuit's remand. The only question that remains before the Court is "which claims, if any" in Exhibit 9 were for legitimate referrals through HCI's standard rotation system. *Id.* Note the specifics of the Seventh Circuit's phrasing: the fact that at least *some* of the referrals in Exhibit 9 were fraudulent has been established and affirmed. *Id.* at 902 (this Court should "clarify which Medicare claims, all or some, resulted from the defendants' illegal kickback scheme").

Yet Defendants have spent every other breath since the Seventh Circuit's remand insisting that *all* of the referrals on Exhibit 9 were legitimate. *See, e.g.,* dkt. 469 at *3 ("Plaintiff has not proved the existence of any claims that arose from data mining as opposed to from the routine rotational referral."). The Court will not countenance Defendants' attempt to relitigate the issue of liability. The fact that Defendants paid kickbacks to HCI for referrals has been proven by a preponderance of the evidence. Plaintiffs bear the burden of proving damages, but at this point they have met their burden. *See* 31 U.S.C. § 3731; dkt. 257 at *6–8; dkt. 282 at *2–3. Defendants can still prevail with respect to individual claims if they have evidence that the claim in question was legitimate. But what Defendants cannot do is to insist on an incorrect burden of proof and assert that damages should be zero because Plaintiffs allegedly have not proven the fraudulent character of each individual claim. *United States v. Rogan*, No. 02 C 3310, 2006 WL 8427270, at *18 (N.D. Ill. Oct. 2, 2006), *aff'd*, 517 F.3d 449 (7th Cir. 2008) (no more is required to meet plaintiff's burden in a False Claims Act case than a preponderance of the evidence). This is consistent with the Seventh Circuit's opinion, which did not direct this Court to determine which referrals were fraudulent, but rather to determine which referrals, if any, were legitimate. *Stop Illinois II* at 909–10. The Seventh Circuit's assumption was that each referral on

– 13 –

Exhibit 9 is fraudulent absent evidence indicating otherwise, and this Court will not invert the legal assumptions assigned to it on remand. The Court finds that Plaintiffs have met their burden with respect to damages.

B. *Rotational Referrals and Kickbacks*

Defendants maintain, based on Mr. Sayeed's testimony in 2021, that any potential clients identified through MPI's data mining operation were subsequently sent back to HCI, which then placed those clients into the regular rotational referral system, at which point some clients were rotationally referred back to MPI. *See, e.g.,* dkt. 487 at *9. Even putting aside that this theory of a series of back-and-forth referrals stretches plausibility to the breaking point, there are at least two major legal issues with Defendants' position. The first is that the Court has already found Mr. Sayeed 2021 testimony "implausible… given the inconsistencies between his testimony in 2019 and 2021." Dkt. 360 at *4. Given that finding, Defendants' argument treads on thin ice by relying on Mr. Sayeed's 2021 testimony to assert that the referrals in Exhibit 9 came through rotational referrals from HCI. *See* dkt. 469 at *1.

Second, even if this position is correct as a matter of fact, it would not thereby render the claims in question legitimate. As the Seventh Circuit emphasized during this case's first appeal, "the definition of a referral under the Anti-Kickback Statute is broad, encapsulating both direct and indirect means of connecting a patient with a provider. It goes beyond explicit recommendations to include more subtle arrangements. And the inquiry is a practical one that focuses on substance, not form." *Stop Illinois Health Care Fraud, LLC v. Sayeed*, 957 F.3d 743, 750 (7th Cir. 2020). More recently, during this case's second appeal, the Seventh Circuit stated that if any legitimate claims exist in Exhibit 9, they would necessarily "bear no causal connection to the data-mining scheme." *Stop Illinois II* at 909. Here, even if Defendants' theory is correct, the clients at issue would only have been rotationally-referred back to MPI because MPI had earlier identified and contacted them as part of its illegal data

mining operation. But for Defendants' identification, such a referral would not have happened. *See id.* at 908–09. Consequently, such a referral would still be the product of illegal kickbacks to HCI—it would be fruit of a poisoned tree. *Id.* Thus, the Court rules that, if Defendants are to claim that any referral in Exhibit 9 is non-fraudulent, then it will be insufficient to show merely that the referral came through the rotational referral system if the client's position in that system is itself the product of Defendants' illegal kickback scheme. To reiterate what the Court of Appeals stated in its most recent opinion, only claims with no causal connection to Defendants' illegal kickback scheme can be legitimate. *Id.* at 909.

## CONCLUSION

For the reasons given above, the Court grants Plaintiff-Relator's Motion [494]. The Court strikes all documents offered to the Court by Defendants that were not disclosed in discovery, including but not limited to docket entry 478-1. The Court will also strike the testimony of Ms. Theodoropoulos at the October 16, 2024 hearing, as well as docket entries 488 and 492. Finally, the Court strikes any oral or written argument concerning damages advanced by Defendants to the extent that it relies upon stricken evidence, including but not limited to applicable portions of Defendants' arguments on October 16, 2024 and applicable portions of docket entries 469, 478, 487, and 497. The Court will impose immediate monetary sanctions on Defendants amounting to $317,482.16 (for Defendant Vital Homes) and $276,615.06 (for Defendant Physician Care). Additionally, the Court will impose continuing sanctions of the same amount on Defendants to be assessed every thirty days after the issuance of this order until the matter of damages has been resolved or the case is otherwise terminated. If the Parties reach a settlement in principle then further assessments of the continuing sanctions will be stayed pending finalization of the settlement. However, if the Parties ultimately do not reach settlement following such a stay, then any stayed assessments will be applied retroactively. Defendants are directed to deposit the initial sanction funds with the Clerk of Court within 30 days

– 15 –

of this order. Funds for any continuing sanctions should be deposited with the Clerk of the Court within 30 days of the operative assessment. The Clerk will be directed to place all funds in a blocked, interest-bearing account. The Court will determine to what use the funds will be put at the end of the litigation.

**IT IS SO ORDERED.**

Date: 12/15/2025

Entered: _____
SHARON JOHNSON COLEMAN
United States District Judge